UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-------------------------------------------------------------------
CONTINENTAL CASUALTY COMPANY,

Plaintiff,

    -against-

DIIANA OLIVER-STEINBERG,

Defendant.

-------------------------------------------------------------------

**CONTINENTAL'S COMPLAINT FOR DAMAGES AND DECLARATORY RELIEF**

Plaintiff, Continental Casualty Company ("Continental"), by its counsel, Cozen O'Connor P.C., interposes this complaint for damages and declaratory relief against defendant Diiana Oliver-Steinberg ("Oliver-Steinberg"). In support, Continental alleges the following:

### PRELIMINARY STATEMENT

1. This action arises from a sophisticated insurance fraud scheme orchestrated by defendant Diiana Oliver-Steinberg, who manufactured a claim for long-term care benefits based on an alleged physical and cognitive incapacity. While purporting to be a "chronically ill individual" requiring 24-hour professional nursing care in New York, Oliver-Steinberg was actually an active member of the community who utilized a fraudulent "umbrella" arrangement to secure high-cost reimbursements in the form of benefits for unapproved staff and housekeepers in her home.

2. The heart of the scheme involved a coordinated financial kickback arrangement where Oliver-Steinberg issued payment checks to her supposed caregiver, only to require that a "big portion" of those funds be electronically rebated back to her via her accountant. This was fraud.

1

3.     Moreover, Oliver-Steinberg's caregiver, who supposedly resided with and provided care to Oliver-Steinberg in New York, was, at all material times, actually a resident of Texas. Upon being confronted with evidence of her caregiver's residency in Selma, Texas and the falsification of Proof of Loss documents concerning the same, Oliver-Steinberg's caregiver formally resigned from her caregiving role and admitted during a recorded telephone call to being "led wrong" by Oliver-Steinberg into participating in the deception.

4.     In total, Oliver-Steinberg's material misrepresentations induced Continental to wrongfully pay $2,448,601.78 in benefits. This lawsuit seeks the recovery of those funds, a judicial declaration that Oliver-Steinberg's coverage is void, plus fees and punitive damages.

## PARTIES

5.     Continental is an insurance company organized and existing under the laws of the State of Illinois with its principal place of business located at 151 N. Franklin Street, Chicago, Illinois 60606.

6.     Continental is a citizen of Illinois.

7.     Oliver-Steinberg is an adult individual residing at 60 Gramercy Park, Apartment 4C, New York, New York 10010.

8.     Oliver-Steinberg is a citizen of New York.

## JURISDICTION AND VENUE

9.     Jurisdiction is proper in this Court pursuant to 28 U.S.C. § 1332 because the dispute is between citizens of different states and the amount in controversy exceeds the sum of $75,000, exclusive of interest and costs.

10.     Venue is proper in the United States District Court for the Southern District of New York pursuant to 28 U.S.C. § 1391(b)(1) because the Southern District of New York is the judicial

2

district in which Oliver-Steinberg resides.

11.    Venue is also proper in the United States District Court for the Southern District of New York pursuant to 28 U.S.C. § 1391(b)(2) because the Southern District of New York is the judicial district where a substantial part of the acts and omissions giving rise to Continental's claims against Oliver-Steinberg occurred.

## FACTS COMMON TO ALL COUNTS

12.    This is an action in which Continental alleges fraud and other causes of action against Oliver-Steinberg in connection with a claim for benefits under a long-term care insurance policy ("Policy") issued to Oliver-Steinberg by Continental.

13.    Oliver-Steinberg represented to Continental for approximately 13 years that she was entitled to be paid benefits under her Policy for care services she allegedly received in the home each day from a paid caregiver, Ezekeil Chincuanco ("Ezekeil"), due to functional limitations from which Oliver-Steinberg claimed to suffer.

14.    In fact, the claim was a sham. Oliver-Steinberg defrauded Continental of $2,448,601.78 of insurance benefits in connection with the claim.

15.    Oliver-Steinberg committed insurance fraud in at least three broad and sweeping ways, each of which independently qualifies as fraud under the law.

16.    *First*, Oliver-Steinberg represented to Continental that she met the benefit eligibility triggers in the Policy due to severe functional limitations that allegedly led her to require hours of care from a paid caregiver in the home each day.

17.    In fact, Oliver-Steinberg did not have benefit-qualifying functional limitations for which she required care in the home. Oliver-Steinberg was fully aware that her representations to Continental regarding her functionality were false and that she was not functionally impaired in a

3

manner that would have allowed her to seek benefits under her coverage. This was fraud.

18.     **Second**, Policy benefits were only available if Oliver-Steinberg *required* and *received* Qualified Long-Term Care Services ("QLTCS") in accordance with a written Plan of Care ("POC"), as those terms are defined in the Policy.

19.     Oliver-Steinberg represented to Continental over the life of her claim that she required and received QLTCS in accordance with a written POC when, in fact, she did not.  This was fraud.

20.     **Third**, Oliver-Steinberg was required to provide true and correct written Proof of Loss to Continental in which she specified the dates, times, and nature of care services she allegedly received from a paid caregiver, plus the amounts she actually paid for care.  Continental was only required to pay benefits to the extent Oliver-Steinberg provided true and correct Proof of Loss for paid care services she actually received.  Oliver-Steinberg, however, provided false Proof of Loss and other information to Continental in which she described the receipt and payment for care services that were never actually rendered but were a complete fiction.

21.     Indeed, as stated above, Oliver-Steinberg's supposed paid caregiver, Ezekeil, did not even live in New York, but in Texas.  Nevertheless, Oliver-Steinberg and Ezekeil concocted an elaborate scheme under which payments for care services that were never actually rendered to Oliver-Steinberg were made to Ezekeil for the purpose of giving Continental the false impression that care services were being provided and paid for (when they were not), only for Ezekeil to then rebate substantially all of the payment amounts back to Oliver-Steinberg via her accountant, less a small fee to Ezekeil for participating in the scheme.  This was fraud.

22.     Continental performed multiple periods of surveillance. The surveillance, along with Continental's other investigative efforts, showed that Oliver-Steinberg clearly was not

eligible for benefits and knowingly made false representations concerning the same; that Oliver-Steinberg did not receive QLTCS in accordance with a written POC; and that Oliver-Steinberg submitted false Proof of Loss and other information to Continental in which she described the receipt and payment for care services that were never actually rendered.

23.    By knowingly misrepresenting facts concerning her functionality, alleged receipt of care services and payment for care, Oliver-Steinberg fraudulently induced Continental to pay long-term care insurance benefits she was not lawfully entitled to receive.

**A.    The Insurance Coverages at Issue**

24.    On or about November 5, 1998, acting in reliance on Oliver-Steinberg's representations in application materials, Continental issued to Oliver-Steinberg Long-Term Care Insurance Policy No. 076660029 (the "Policy").

25.    At issuance, Oliver-Steinberg was designated as the insured and owner of the Policy.

26.    Oliver-Steinberg was also the beneficiary of the Policy when issued, meaning benefits under the Policy, if any, would be paid to Oliver-Steinberg.  A true and correct copy of the Policy is attached hereto as **Exhibit A**.

27.    The Policy provides coverage for Home Health Care Services in the event Oliver-Steinberg meets the Policy's definition of a Chronically Ill Individual, among other requirements.

28.    Chronically Ill Individual is defined in pertinent part to mean that Oliver-Steinberg has been certified by a Licensed Health Care Practitioner as "1. being unable to perform (without substantial assistance from another individual) at least 2 Activities of Daily Living for a period of at least 90 days due to a loss of functional capacity, or requiring substantial supervision to protect Yourself from threats to health and safety due to severe Cognitive Impairment."

5

29.    The definition of Chronically Ill also provides: "You will not be considered Chronically Ill for any period unless within the 12 months prior to such period a Licensed Health Care Practitioner has certified that You meet the above requirements."

30.    The Policy defines Activities of Daily Living ("ADLs"), including Eating, Dressing, Bathing, Toileting, Transferring, and Continence.

31.    The Policy defines Cognitive Impairment as: "A deficiency in Your short- or long-term memory, orientation as to person, place and time, deductive or abstract reasoning, or judgment as it relates to safety awareness."  In order to qualify for benefits, the Cognitive Impairment must be objectively "severe."

32.    Thus, in summation, in the event Oliver-Steinberg needed substantial assistance from another person to perform two or more of the six ADLs defined in the Policy, or she required substantial supervision to protect herself from threats to health and safety due to severe Cognitive Impairment, the Policy would pay benefits to Oliver-Steinberg provided Oliver-Steinberg satisfied all other Policy requirements concerning the payment of benefits.

33.    For the sake of this lawsuit, two other Policy requirements are directly implicated.

34.    *First*, assuming Oliver-Steinberg was Chronically Ill, benefits under the Policy were only triggered and paid if Oliver-Steinberg incurred *actual expenses* for QLTCS (as defined in the Policy) that were *actually rendered* to her in accordance with a POC (as defined in the Policy).  This meant that Oliver-Steinberg needed to *actually receive* professional care services in exchange for remuneration, then submit invoices and other written Proof of Loss to Continental in order for benefits to be paid.

35.    QLTCS is defined, *inter alia*, to mean "necessary diagnostic, preventative, therapeutic, curing, treating, mitigating, and rehabilitative services, and maintenance or Personal

Services, which: 1. are required by a Chronically Ill Individual, and 2. are provided pursuant to a Plan of Care prescribed by a Licensed Health Care Practitioner."

36.    POC is defined, *inter alia*, to mean "A program of care and treatment: 1. Established and approved in writing by a Licensed Health Care Practitioner before the start of such care and treatment; and 2. Confirmed in writing at least once every 60 days."

37.    ***Second***, Oliver-Steinberg needed to provide true and correct written Proof of Loss and other information to Continental as a contractual precondition to any claim being paid.  The written Proof of Loss needed to include, among other things, a written statement describing the type and nature of loss.  Absent the submission of this information, and the truthfulness thereof, Continental had no duty to pay Oliver-Steinberg's claim.

### B.    Oliver-Steinberg's Claim for Benefits Under the Policy

38.    On or about April 1, 2013, Oliver-Steinberg contacted Continental's administrative team to initiate a request for long-term care benefits under the Policy, citing functional limitations arising from "post-spinal surgeries."

39.    In connection with that request, on or about April 1, 2013, Continental's claim team explicitly notified Oliver-Steinberg in writing that any reimbursement of benefits would be strictly conditioned upon her meeting the Policy's functional eligibility requirements, and that she was contractually required to submit itemized billing, caregiver notes, and a fully completed Claimant's Statement.

40.    Following her inquiry, Oliver-Steinberg submitted an Individual Long Term Care Claim Form Claimant's Statement to Continental, signed by her authorized representative, and certified that she required "Home Health Care" benefits due to "post-spinal surgeries."

41.    On this initial statement, Oliver-Steinberg explicitly represented that her anticipated need for care would be limited to "1 year."

42.    To maintain, substantiate, and systematically extend this stream of long-term care benefits beyond her initial one-year baseline representation, Oliver-Steinberg was periodically required by her policy and federal law to undergo Benefit Eligibility Assessments ("BEAs") administered by independent licensed healthcare practitioners who were not affiliated with Continental.

43.    These assessments served as the structural mechanism through which Oliver-Steinberg repeatedly reaffirmed her ongoing eligibility and clinical dependence to Continental's clinical reviewers.

44.    Throughout these recurrent BEAs, Oliver-Steinberg made, verified, and authorized a consistent matrix of baseline representations designed to simulate a severe, static, and un-remediable baseline of physical impairment.

45.    Specifically, Oliver-Steinberg consistently represented that her underlying medical history compromised her independent mobility and left her entirely incapable of walking or safely performing essential ADLs without direct intervention.

46.    In addition to detailing a wide range of supposedly debilitating medical conditions, Oliver-Steinberg utilized the BEAs to report and reinforce her supposed care regimen to Continental's administrators.

47.    Oliver-Steinberg affirmatively represented to assessing personnel that she required an intensive, private home health care schedule managed on a continuous 12-to-24-hour per day, 7-day per week operational basis, by paid caregivers.

48.     To substantiate the financial outlays tied to this purported schedule, Oliver-Steinberg represented that she was personally retaining private caregivers—specifically identifying her primary provider as Ezekeil—at a recurring private cost reaching up to $3,300 per week, thereby verifying the baseline economic losses she claimed to endure – losses for which she sought reimbursement under the Policy in the form of benefit payments.

49.     On or about February 2, 2018, Oliver-Steinberg executed and submitted a subsequent formal Individual Long Term Care Claim Form to Continental to continue securing benefits under the Policy.

50.     In the 2018 Claim Form, Oliver-Steinberg synchronized her written representations with the prior and ongoing representations established during her BEAs to maintain the superficial legitimacy of her claim.

51.     Oliver-Steinberg, among other things, (1) represented that she required continuous, non-institutional "Home Health Care" benefits; (2) affirmatively extended her timeline for required care from her initial 2013 baseline estimate of "1 year" to an permanent, indefinite "yearly with renewal" basis; and (3) certified that the medical conditions dictating her purported 24-hour continuous care and severe functional limitations consisted of "post spinal" issues and surgeries to her "knee" and "abdomen."

52.     In further support of her 2018 Claim Form and to project a false narrative of comprehensive medical oversight, Oliver-Steinberg appended a handwritten, line-item list of "attending/primary physicians" to Continental, asserting ongoing treatment from over a dozen separate medical providers and specialists across New York City.

53.     Oliver-Steinberg's representations during these claims and BEAs were false, were known by Oliver-Steinberg to be false, and were made with the intent of enabling Oliver-Steinberg

9

to be paid benefits under the Policy that she was not lawfully entitled to receive.

54.     Based on Oliver-Steinberg's representations, Continental approved Oliver-Steinberg's claim and began paying benefits to Oliver-Steinberg under the Policy.

### C.     Ezekeil's Involvement and Submission of False Proof of Loss

55.     Ezekeil is a Licensed Practical Nurse who has served as the purported primary caregiver for Oliver-Steinberg since approximately 2014.

56.     Upon information and belief, Ezekeil is the daughter of Dang Chincuanco Balisalisa.

57.     Upon information and belief, Dang Chincuanco Balisalisa worked for Oliver-Steinberg.

58.     Upon information and belief, Oliver-Steinberg, with the assistance of Chincuanco Balisalisa, recruited Ezekeil to assist with a fraudulent scheme to defraud Continental.

59.     Upon information and belief, Ezekeil is also related to Oliver-Steiberg's supposed housekeeper, Theresa Balisalisa.

60.     Upon information and belief, Oliver-Steinberg, with the assistance of housekeeper Theresa Balisalisa, recruited Ezekeil to assist with a fraudulent scheme to defraud Continental.

61.     Since 2014, Oliver-Steinberg represented to Continental that Ezekeil was her sole care provider and that Ezekeil resided with her at the Gramercy Park residence in New York to provide 24-hour assistance.

62.     Specifically, Oliver-Steinberg repeatedly certified in numerous BEAs—including those conducted in 2015, 2016, 2017, 2019, 2020, 2021, 2022, 2023, 2024, and 2025—that Ezekeil was the exclusive individual responsible for providing her with hands-on assistance for ADLs

63.    In support of these representations, Oliver-Steinberg and Ezekeil submitted regular timesheets and other Proofs of Loss to Continental, which were signed and certified as "complete and true," documenting Ezekeil's alleged continuous care.

64.    As a contractual precondition to the payment of benefits under the Policy, Oliver-Steinberg and her putative caregiver, Ezekeil, were required to provide Continental with true and correct written Proof of Loss in support of Oliver-Steinberg's claim.

65.    Oliver-Steinberg and her putative caregiver were required to complete, sign and submit a Proof of Loss form each week over the life of the claim in order to be paid benefits.

66.    In each Proof of Loss form, Oliver-Steinberg and her putative caregiver were required to (and did) state the specific dates and times when Oliver-Steinberg received care services in the home, and for which she was claiming benefits under the Policy.  Each Proof of Loss form also stated the specific care services that were allegedly provided to Oliver-Steinberg on each reported date of care.

67.    Thus, it was clear to Oliver-Steinberg that her representations in each form would be used by Continental to determine whether it would pay benefits and the amount of benefits to be paid.  Indeed, Continental had no duty under the Policy to pay benefits in the absence of these submissions.

68.    Oliver-Steinberg completed and submitted to Continental a Proof of Loss form covering every claimed date of care over the life of her claim.  In other words, Oliver-Steinberg made hundreds of discrete written representations to Continental in support of the claim over the course of years.

69.    The Proof of Loss provided by Oliver-Steinberg was essential to Continental's evaluation of the claim and payment of benefits.  It was one of the primary means by which

Continental was led to believe that Oliver-Steinberg remained eligible for benefits under the Policy.  Absent the continuous submission of Proof of Loss, Oliver-Steinberg's claim would not have been paid.

70.     Upon information and belief, all Proof of Loss provided to Continental over the life of the claim was false, was known by Oliver-Steinberg to be false, and was fabricated by Oliver-Steinberg for the singular purpose of inducing Continental to pay Oliver-Steinberg's fraudulent claim.

**D.       Continental's Claim Investigation**

**1. October 2025 Surveillance – Ezekeil in Texas**

71.     On October 4, 21, and 22, 2025, Continental performed surveillance on Ezekeil in Selma, Texas.

72.     Also for the dates of October 4, 21, and 22 2025, Oliver-Steinberg provided signed Proof of Loss to Continental representing that she received paid QLTCS from Ezekeil in the home, in New York, of a specific nature and at specific times in accordance with her POC.

73.     During the time when Continental conducted surveillance, Oliver-Steinberg was on claim with Continental. She purported to be eligible to receive benefits under the Policy.

74.     Continental's surveillance revealed that despite representing that Ezekeil was providing care services to Oliver-Steinberg in New York, Ezekeil was actually in Selma, Texas. Critically, Ezekeil did not arrive or depart Oliver-Steinberg's home in New York, as reported in her signed Proof of Loss.  Clearly, care was not provided (or needed) during the period of surveillance.

75.     Continental's observations on video could not be reconciled with Oliver-Steinberg's representations and her written Proof of Loss for the very same time period.

Continental determined that additional investigation was appropriate.  Some of Continental's many observations of Ezekeil in Texas included the following:










13

 

 

 

14

**2. November 2025 Surveillance – Ezekeil in Texas (Again)**

76.    On November 11, 14, and 15 2025, Continental conducted additional surveillance.

77.    Also for the dates of November 11, 14, and 15, 2025, Oliver-Steinberg provided signed Proof of Loss to Continental representing that she received paid QLTCS from Ezekeil in the home, in New York, of a specific nature and at specific times in accordance with her POC.

78.    During the time when Continental conducted surveillance, Oliver-Steinberg was on claim with Continental. She purported to be eligible to receive benefits under the Policy.

79.    Continental's surveillance again revealed that despite representing that Ezekeil was providing care services to Oliver-Steinberg in New York, Ezekeil was actually in Texas. Critically, Ezekeil did not arrive or depart Oliver-Steinberg's home in New York, as reported in her signed Proof of Loss.  Clearly, care was not provided (or needed) during the period of surveillance.

80.    Moreover, Oliver-Steinberg did not receive care from Ezekeil on any date or at any time during the period of surveillance.  Indeed, the two were never observed together and Ezekeil was never observed arriving at or leaving Oliver-Steinberg's residence.

81.    Upon information and belief, Oliver-Steinberg did not pay for care during the time period of surveillance because, in fact, there was no care to pay for. Alternatively, Oliver-Steinberg paid Ezekeil a small amount of money for participating in the scheme to defraud Continental and to maintain the superficial appearance of legitimacy about the claim, while simply pocketing for herself the remainder of the benefits Continental paid each month.

82.    Similarly, Oliver-Steinberg did not receive Qualified Long-Term Care Services in accordance with a Plan of Care.

15

83.     Some of Continental's many observations included the following:

 

 

 



 

### 3. January 20, 2026 Interview of Ezekeil

84.     On January 20, 2026, Continental conducted a recorded interview of Oliver-Steinberg's purported caregiver, Ezekeil.

85.     During the interview, Ezekeil made admissions that directly contradict the Proof of Loss forms and the alleged necessity of the care services for which Oliver-Steinberg claimed benefits.

86.     First, Ezekeil provided inconsistent and irreconcilable statements regarding her remuneration for care that was supposedly provided to Oliver-Steinberg.

17

87. When asked for her daily rate, she initially provided the highly specific figure of $106.66.

88. After realizing the specificity of that figure was being questioned, Ezekeil abruptly changed her position, claiming instead that she was paid $600 per day.

89. Ezekeil attempted to explain the $106.66 figure by claiming it was a separate check she received from Oliver-Steinberg's stepson merely for "being there" in New York, further undermining the legitimacy of the professional caregiver relationship.

90. Second, Ezekeil admitted that the care services she supposedly provided were largely social or supervisorial rather than the Qualified Long-Term Care Services required by the Policy. Ezekeil characterized her role as "keeping her company" because Oliver-Steinberg "doesn't really have people to do that [referring to receiving care]."

91. Ezekeil further admitted that for significant portions of the day, she is merely on "standby" while Oliver-Steinberg naps, reads, or watches television.

92. Third, Ezekeil stated that she uses her time at the Oliver-Steinberg residence to pursue her own personal online education and software courses, often during hours when she is purportedly providing care.

93. Fourth, Ezekeil admitted that the daily visit notes and weekly timesheets submitted to Continental are essentially static and repetitive, stating they are "all the same" because Oliver-Steinberg "does not do very much." Ezekeil did not provide QLTCS in accordance with Oliver-Steinberg's written POC as required by the Policy.

94. Fifth, Ezekeil identified a housekeeper, Theresa Balisalisa, who resides in the home five days a week and provides supervision and meal preparation. Balisalisa is not an approvable caregiver under the terms of the Policy and, to the extent Balisalisa ever provided "care" to Oliver-

18

Steinberg (which is disputed by Continental), such care would not have been approvable and benefits would not have been paid for the same under the Policy.

95.     Finally, Ezekeil showed significant awareness of guilt during the interview. Despite initially agreeing to provide information, she eventually expressed that the interview "doesn't sit right" with her and terminated the call early to avoid further recorded questioning.

96.     Ezekeil's statements, when compared against Continental's surveillance and the submitted Proof of Loss, confirm that false representations were made to Continental to induce Continental to pay benefits for services that were either unnecessary, unrendered, or non-qualifying.

### 4. January 21, 2026 Telephonic Interview

97.     Ezekeil agreed to participate in a second recorded interview the following day. During a January 21, 2026, interview, Oliver-Steinberg and Ezekeil were both on the telephone and provided conflicting representations regarding where Ezekeil actually resides, further undermining the claim that she provided 24-hour care to Oliver-Steinberg, or any care *at all*.

98.     While Ezekeil had previously represented that she lived at the Gramercy Park residence full-time, Oliver-Steinberg admitted that Ezekeil "has her own place," which she believed was located in Westchester.

99.     When Oliver-Steinberg realized she had contradicted the narrative of a live-in caregiver, she attempted to walk back the statement with a nonsensical "analogy," claiming Ezekeil only has another residence for "facilities purposes."

100.     Oliver-Steinberg further represented that she was in a state of severe functional incapacity, claiming she had just finished an "exercise session" with a rehab person named Renee.

101.    However, despite this purported state of recovery and rehab, Ezekeil continued to insist that Oliver-Steinberg "is not able to walk" more than a few blocks and would be "trampled" in New York City without a caregiver.

102.    The interview also revealed a coordinated effort to shield the fraud from Continental's detection.

103.    Ezekeil admitted that after the previous day's interview, Oliver-Steinberg became "quite angry" that she had shared "personal health information" with the insurer.

104.    Ezekeil also attempted to use Oliver-Steinberg's alleged "memory loss" as a strategic shield, telling the investigator that Oliver-Steinberg "does not remember a lot of stuff" when her answers did not align with previous statements.  This assertion, however, was undercut entirely by the interview itself, in which Oliver-Steinberg was completely lucid and conversative, and showed no signs of any cognitive limitation.

105.    Furthermore, Ezekeil admitted that she does not follow a professional Plan of Care (as specifically required by the Policy), but instead completes the Proof of Loss daily visit notes with false and overstated information "as I was instructed by [Oliver-Steinberg's] accountant," suggesting the Proof of Loss provided to Continental was entirely fabricated rather than a true and correct record of care services actually rendered.

106.     This second interview confirmed that Oliver-Steinberg and Ezekeil were engaged in a collaborative scheme to misrepresent the caregiver's residency, the frequency and nature of care, if any, and the insured's actual physical and/or psychological capabilities.  This was done for the purpose of maintaining fraudulent access to insurance benefits.

**5. January 21, 2026 Virtual Interview – The "Kickback Scheme" Admission**

107.    On January 21, 2026, Continental conducted a third recorded interview of Oliver-Steinberg and Ezekeil. During the third interview, the investigator presented Ezekeil for the first time with evidence of her residency and activities in Texas, including Facebook posts and public records. This, of course, was a watershed moment in the investigation because Ezekeil and Oliver-Steinberg knew they had been caught making misrepresentations in the two preceding interviews (where it was represented that Ezekeil was, in fact, providing care in New York).

108.    Confronted with this evidence, Ezekeil admitted that she does not live at the Gramercy Park residence and that she was, in fact, in Texas during periods when she claimed to be providing 24-hour care to Oliver-Steinberg in New York.

109.    Most significantly, Ezekeil admitted to a systemic financial kickback scheme. She revealed that although Oliver-Steinberg (through her accountant) issued her bi-weekly checks to Ezekeil for $8,400.00 in order to give Continental the impression that payments were being made for care services rendered, Ezekeil did not keep nearly the full amount. Rather, Ezekeil rebated most of the money to Oliver-Steinberg.

110.    Ezekeil admitted that upon depositing the $8,400.00 checks, she was instructed to—and did—electronically transfer a "big portion" of that money back to Oliver-Steinberg via Oliver-Steinberg's accountant. Ezekeil stated she would only keep a small amount for herself and returned the remainder to Oliver-Steinberg.

111.    Ezekeil confessed that she signed and submitted false Proof of Loss forms to Continental for 24-hour care she did not actually provide because Oliver-Steinberg and her accountant "told me a nurse had to do it" to ensure the claim would be reimbursed by Continental. In other words, Oliver-Steinberg, Ezekeil and the accountant all knew that other persons (such as

21

Oliver-Steinberg's housekeeper, Theresa Balisalisa) could not provide covered care under the Policy and that Oliver-Steinberg was not entitled to and would not be paid benefits for the same.

112.    Oliver-Steinberg, who was present during the interview, attempted to justify the false submissions by claiming she was "reimbursed for nursing care" and that Ezekeil was merely "supervising things" from afar.  These representations were false.  And even if they were true (they were not), they would not have created a situation under which benefits would have been owed or paid under the Policy.

113.    The third interview further revealed that the care services, if any, were actually provided to Oliver-Steinberg by a rotating cast of unapproved and unlicensed "relievers," including the housekeeper, Theresa Balisalisa, and individuals identified as Phoebe Geronimo and Thelma Pena Nueva.

114.    Oliver-Steinberg admitted that these relievers were paid "out of pocket" and in "cash," while Ezekeil's name was used as a fraudulent "umbrella" to secure reimbursements from Continental for high-cost professional nursing services that were simply never rendered.

115.    Balisalisa, the housekeeper, was involved with the interview and admitted during the interview that Oliver-Steinberg "doesn't really need a nurse" and that Oliver-Steinberg decided to file the claim with Continental simply because she "invested money to get a long-term care" policy and felt entitled to use it regardless of actual eligibility.

116.    By the conclusion of the interview, Ezekeil expressed extreme remorse and "paranoia," stating she wanted to resign immediately because she realized she had been "led wrong" into participating in a fraudulent scheme.

117.    These admissions prove that Oliver-Steinberg, with the assistance of Ezekeil, her accountant, and unapproved staff, intentionally manufactured a claim, falsified Proof of Loss

documents, and engaged in a kickback scheme to defraud Continental of over $2,448,601.78.

### 6. January 2026 Surveillance – Ezekeil in Texas (Again)

118. On January 22, 2026, Continental conducted additional surveillance.

119. During the time when Continental conducted surveillance, Oliver-Steinberg was on claim with Continental. She purported to be eligible to receive benefits under the Policy.

120. Continental's surveillance again revealed that despite representing that Ezekeil was providing care services to Oliver-Steinberg in New York, Ezekeil was actually in Texas. Critically, Ezekeil did not arrive or depart Oliver-Steinberg's home in New York, as reported in her signed Proof of Loss.  Clearly, care was not provided (or needed) during the period of surveillance.

121. Moreover, Oliver-Steinberg did not receive care from Ezekeil on any date or at any time during the period of surveillance.  Indeed, the two were never observed together and Ezekeil was never observed arriving at or leaving Oliver-Steinberg's residence.

122. Upon information and belief, Oliver-Steinberg did not pay for care during the time period of surveillance because, in fact, there was no care to pay for. Alternatively, Oliver-Steinberg paid Ezekeil a small amount of money for participating in the scheme to defraud Continental and to maintain the superficial appearance of legitimacy about the claim, while simply pocketing for herself the remainder of the benefits Continental paid each month.

123. Similarly, Oliver-Steinberg did not receive Qualified Long-Term Care Services in accordance with a Plan of Care.

124. Some of Continental's many observations included the following:

 

### 7. Continental Closed its Investigation

125. On January 23, 2026, Ezekeil initiated a fourth and final telephone call with Continental's investigator.

126. During this call, Ezekeil formally notified Continental that she had "removed herself from that situation" and resigned as Oliver-Steinberg's caregiver.

127. Ezekeil represented that her decision to resign was the result of discovering "how misinformed" she had been regarding the legitimacy of the claim and the legal requirements for receiving insurance benefits.

128. In an apparent attempt to distance herself from the legal consequences of the fraudulent scheme, Ezekeil alleged that Oliver-Steinberg had instructed her to "direct you or whatever else to her," claiming that Oliver-Steinberg intended to "assume all responsibilities" for the false claim.

129. Despite previously representing to the investigator that Oliver-Steinberg suffered from significant memory issues and potential Alzheimer's disease, Ezekeil insisted that the

investigator deal only with Oliver-Steinberg regarding the fraudulent financial records.

130.    When the investigator confronted Ezekeil with the fact that, on paper, Continental had reimbursed over $2 million in benefits based on the false documentation submitted under her name since 2014, Ezekeil refused to provide further clarification.

131.    Ezekeil repeatedly declined to assist Continental in calculating the specific dates she was in Texas versus New York, stating only that she wanted to "remove myself from all of this."

132.    Ezekeil eventually terminated the call and disconnected the line to avoid further questioning.

133.    The sudden resignation of Ezekeil and her refusal to provide key details of unrendered services further demonstrate the illegitimacy of the claim and Oliver-Steinberg's direct role in orchestrating misrepresentations to Continental.

134.    Based on all information in its possession, Continental closed its investigation and determined that Oliver-Steinberg had, in fact, engaged in fraud.

135.    Based on the totality of the evidence—including multiple periods of surveillance, the admissions of Ezekeil Chincuanco, and the conflicting statements of Oliver-Steinberg and her housekeeper—Continental determined that Oliver-Steinberg had engaged in a protracted and intentional scheme to defraud Continental.

136.    The evidence confirms that Oliver-Steinberg's functional capacity was a fabrication. Despite representing to Continental that she required significant assistance with ADLs surveillance and the testimony of her own staff revealed she was fully capable of independent movement and community activity.

137. Furthermore, Oliver-Steinberg's claim for 24-hour professional nursing care was a sham. Continental's investigation proved that Ezekeil Chincuanco was not present in the home (or even the state) for significant periods of time and, in fact, maintained a primary residence and personal business interests in Texas during the pendency of the claim.

138. Continental determined that Oliver-Steinberg, with the assistance of her associates, utilized Ezekeil's professional credentials as a fraudulent "umbrella" to secure reimbursements for care that was either never rendered or was provided by unapproved, unlicensed and unprovable staff.

139. Most egregious was the discovery of the financial kickback scheme, where Oliver-Steinberg induced Continental to pay benefits based on falsified checks, only to require the caregiver to electronically kickback a substantial portion of those funds to Oliver-Steinberg for her personal use.

140. Continental has paid Oliver-Steinberg a total of $2,448,601.78 in benefits as a direct result of these material misrepresentations. But for this fraud, the Policy would have lapsed and terminated for nonpayment of premium.

141. Oliver-Steinberg's conduct was not a mere misunderstanding of policy terms; it was a sophisticated effort to launder insurance benefits through a "kickback" arrangement that shocks the conscience and warrants an award of punitive damages and fees.

142. Oliver-Steinberg's kickback scheme was so outrageous as to evince a high degree of moral turpitude as to imply a criminal indifference to civil obligations.

143. Oliver-Steinberg's kickback scheme was predicated upon willful and wanton conduct to defraud Continental.

144. Accordingly, Continental seeks a declaration that the Policy is void due to Oliver-Steinberg's egregious breach of the implied covenant of good faith and fair dealing and principles of *uberrimae fidei*, for which there is no adequate remedy at law.

### COUNT 1 – FRAUD

145. Continental incorporates the preceding paragraphs of the Complaint as though set forth fully here.

146. Oliver-Steinberg did knowingly and intentionally misrepresent, or cause to be misrepresented, material facts to Continental as described in the Complaint, at least the following ways:

a. Creating and perpetuating the false impression that caregivers provided care to Oliver-Steinberg on dates and at times when, in fact, no care was provided;

b. Creating and perpetuating the impression that Oliver-Steinberg was unable to perform two or more ADLs without substantial assistance when, in fact, she was fully capable of performing all ADLs;

c. Creating and perpetuating the false impression that Oliver-Steinberg's care needs, if any, were greater than they were in fact;

d. Creating and perpetuating the false impression that caregivers provided specific kinds of care services to Oliver-Steinberg when, in fact, they did not do so;

e. Creating and perpetuating the false impression that Oliver-Steinberg received QLTCS in accordance with a POC when, in fact, she did not;

f. Creating and perpetuating the false impression that Oliver-Steinberg compensated her putative caregivers for their alleged care services when, in fact, they were not compensated for QLTCS being provided to Oliver-Steinberg in accordance with a

POC as represented to Continental, if at all.

g.  Creating and perpetuating an illicit financial kickback scheme where Oliver-Steinberg issued sham payments to her caregiver, only to mandate that all or most of those funds be systematically and electronically routed back to her.

147.    Oliver-Steinberg made and perpetuated these misrepresentations repeatedly over a continuous period of years with knowledge of their falsity.

148.    Oliver-Steinberg made and perpetuated these misrepresentations with knowledge and intent that the false information would be relied upon by Continental for her benefit and to Continental's detriment.

149.    Continental relied on Oliver-Steinberg's misrepresentations.

150.    Continental was justified in its reliance.

151.    As a direct and proximate result of Oliver-Steinberg's fraudulent misrepresentations, Continental was harmed by paying benefits in the amount of $2,448,601.78 that Oliver-Steinberg was not lawfully entitled to receive.

152.    Continental incurred additional losses in an amount to be determined at trial relating to its cost of investigating the claim undergone by Oliver-Steinberg.

## COUNT 2 – NEGLIGENCE

153.    Continental incorporates the preceding paragraphs of the Complaint as though set forth fully here.

154.    Oliver-Steinberg had an ongoing duty to provide true and correct information to Continental concerning her functionality, claim for benefits under the Policy, receipt of care, and payment for care.

155. By providing false information to Continental as described in this Complaint, Oliver-Steinberg breached her duty to Continental.

156. Continental reasonably relied to its detriment on the false information supplied by Oliver-Steinberg, paying insurance benefits Oliver-Steinberg was not lawfully entitled to receive.

157. Thus, the false information supplied by Oliver-Steinberg to Continental both caused and proximately caused harm to Continental.

158. Continental was damaged in the amount of $2,448,601.78, which Continental would not have paid but for Oliver-Steinberg's submission of false information.

**COUNT 3 – RESTITUTION OF BENEFITS PAID**

159. Continental incorporates the preceding paragraphs of the Complaint as though stated fully here.

160. Continental has no present obligation to pay benefits under the Policy due to one or more of: (1) Oliver-Steinberg's lack of a qualifying ADL deficiency; (2) Oliver-Steinberg's failure to receive care from any caregiver; (3) Oliver-Steinberg's failure to receive the care represented to Continental; (4) Oliver-Steinberg's failure to pay for the care she received, if any, in the manner represented to Continental;  (5) Oliver-Steinberg's failure to receive QLTCS in accordance with a POC; and/or (6) Oliver-Steinberg's failure to provide Continental with true and correct Proof of Loss in support of her claim.

161. Continental had no obligation to pay benefits under the Policy during some or all of the period of Oliver-Steinberg's claim due to one or more of: (1) Oliver-Steinberg's lack of a qualifying ADL deficiency; (2) Oliver-Steinberg's failure to receive care from any caregiver; (3) Oliver-Steinberg's failure to receive the care represented to Continental; (4) Oliver-Steinberg's failure to pay for the care she received, if any, in the manner represented to Continental; (5) Oliver-

Steinberg's failure to receive QLTCS in accordance with a POC; and/or (6) Oliver-Steinberg's failure to provide true and correct Proof of Loss to Continental in support of her claim.

162.    Because Continental has made an overpayment of benefits, Continental is entitled to restitution in the amount of the benefits paid by Continental for all time periods as may be determined by the Court.

**COUNT 4 – DECLARATION THAT THE POLICY IS VOID**

163.    Continental incorporates the preceding paragraphs of the Complaint as though set forth fully here.

164.    The Policy should be declared void by the Court for two primary reasons.

165.    There is an actual, present and justiciable controversy between the parties as to whether the Policy is void for which there is no adequate remedy at law.

**A.    Declaration that the Policy is Void Due to Oliver-Steinberg's Bad Faith and to Protect Continental from Future Harms**

166.    It is necessary and appropriate for the Court to exercise its inherent power to adjust the equities between the parties by declaring the Policy is void so Continental is not forced to remain in contractual privity with a party who has committed fraud and/or acted in bad faith and may attempt to commit additional frauds and bad faith claims practices against Continental in the future.

167.    Insurance contracts are agreements *uberrimae fidei* and are undergirded by a mutual implied covenant of good faith and fair dealing.

168.    By initiating and perpetuating a protracted fraud against Continental, and by prosecuting her claim for benefits in bad faith, Oliver-Steinberg has breached the implied covenant and demonstrated that she is incapable of proceeding in good faith in an ongoing contractual relationship with Continental.  Continental should be protected by the Court from the prospect of

30

future frauds and bad faith by Oliver-Steinberg.

169.    The Policy is void from the inception of her fraudulent claim and should be declared to be of no legal effect, following the principles established in *Lincoln Benefit Life Company v. Dallal*, 2022 WL 605709 (9th Cir. 2022).

B.    **Declaration that the Policy is Void Under the Inherent Power of the Court to Adjust Equities to Compensate Continental for Its Losses**

170.    It is necessary and appropriate for the Court to exercise its equitable powers to declare the Policy is void as a means of compensating Continental for Oliver-Steinberg's fraudulent conduct and bad faith claim practices.

## COUNT 5 – BREACH OF CONTRACT
## (PLEADED IN THE ALTERNATIVE TO COUNTS 1 AND 2)

171.    Continental incorporates the preceding paragraphs of the Complaint as though set forth fully here.

172.    At all material times, the Policy formed a valid and binding contract between Oliver-Steinberg and Continental.

173.    In order to assert a valid claim for benefits under the Policy, Oliver-Steinberg was required to receive QLTCS in accordance with a written POC.

174.    In order to assert a valid claim for benefits under the Policy, Oliver-Steinberg was required to provide written Proof of Loss to Continental.

175.    The written proof of loss submitted by Oliver-Steinberg to Continental in support of a claim for benefits under the Policy needed to be true and correct in order for Continental to determine whether benefits were owed, and the amount of benefits owed, if any.

176.    As discussed throughout the Complaint and incorporated by reference here, Oliver-Steinberg made a claim for benefits under the Policy in which she did not receive QLTCS in

accordance with a POC and submitted materially false Proof of Loss to Continental. At minimum, Oliver-Steinberg's Proof of Loss falsely represented:

    a.   The identity of her care provider(s), if any;

    b.   The dates and times when care services were provided, if ever;

    c.   The amounts paid for care services rendered, if any;

    d.   The nature and level of care services provided, if any; and

    e.   Whether QLTCS was provided in accordance with a POC.

177.    By failing to receive QLTCS in accordance with a POC and submitting Proof of Loss that contained materially false information, Oliver-Steinberg repeatedly breached the requirements of the Policy and caused Continental to pay insurance benefits that Oliver-Steinberg was not contractually or legally entitled to receive.

178.    Similarly, by failing to receive QLTCS in accordance with a POC and submitting Proof of Loss that contained materially false information, Oliver-Steinberg failed to satisfy contractual conditions precedent to the payment of a claim for benefits and, in fact, failed to perfect a claim for benefits under her Policy.

179.    As a result of Oliver-Steinberg's breaches and the failure of conditions precedent, Continental has been damaged in an amount in excess of $2,448,601.78.

## COUNT 6 – BAD FAITH
### (PLEADED IN THE ALTERNATIVE TO COUNTS 1 AND 2)

180.    Continental incorporates the preceding paragraphs of the complaint as though set forth fully here.

181.    As discussed throughout the Complaint, Oliver-Steinberg, acting with no legitimate purpose, made a claim for benefits under the Policy in which she knowingly and intentionally failed to receive QLTCS in accordance with a POC and submitted materially false Proof of Loss

to Continental.  At minimum, Oliver-Steinberg's Proof of Loss falsely represented:

      a.   The identity of her care provider(s), if any;

      b.   The dates and times when care services were provided, if ever;

      c.   The amounts paid for care services rendered, if any;

      d.   The nature and level of care services provided, if any; and

      e.   Whether QLTCS was provided in accordance with a POC.

182.    By knowingly and intentionally failing to receive QLTCS in accordance with a POC and submitting Proof of Loss that contained materially false information, Oliver-Steinberg repeatedly breached the requirements of the Policy and caused Continental to pay insurance benefits that Oliver-Steinberg was not contractually or legally entitled to receive, thereby depriving Continental of the bargain initially intended by the parties.

183.    Oliver-Steinberg was fully aware of the fact that she provided false information to Continental in Proof of Loss submissions. Moreover, Oliver-Steinberg knew that, but for the submission of false information, Continental would not have paid her claim.

184.    As a result of these known and material false submissions, made hundreds of times over the course of years, Oliver-Steinberg not only breached the Policy but acted with ill will and sinister intention in violation of New York law, which holds that the insured, claimant, and/or her representatives have a duty of good faith and fair dealing when asserting a claim for insurance coverage.

185.    As a result of Oliver-Steinberg's breach of the implied covenant of good faith and fair dealing, Continental has been damaged in an amount in excess of $2,448,601.78 in benefits plus additional amounts to be determined at trial, including, but not limited to, Continental's expenditures investigating Oliver-Steinberg's claim, punitive damages, and its fees and costs

associated with the litigation.

**WHEREFORE**, Continental respectfully demands the following relief:

1. Actual and compensatory damages in an amount to be determined at trial, plus interest;

2. Punitive damages;

3. Attorneys' fees;

4. The costs of litigation;

5. A judicial declaration that the Policy is void;

6. A judicial declaration that Continental may retain all of the premium paid for the Policy;

7. Restitution of benefits paid under the Policy from a date to be determined by the Court;

8. Such other relief as may be demonstrated at trial; and

9. Such other relief as the Court deems just and proper.

Dated: June 8, 2026

Brendan P. Hall, Esq. (SDNY: BH0322)
Cozen O'Connor  P.C.
3 WTC, 175 Greenwich Street, 55th Floor
New York, New York 10007
(212) 453-3767
brendanhall@cozen.com
*Counsel for Plaintiff*
*Continental Casualty Company*

*Of Counsel:*
Michael D. Rafalko, Esq.
Cozen O'Connor P.C.
One Liberty Place
1650 Market Street, Suite 2800
Philadelphia, PA 19103
(215) 665-4611
mrafalko@cozen.com
*Counsel for Plaintiff*
*Continental Casualty Company*
*Pro Hac Vice Forthcoming*

To:    Diiana Oliver-Steinberg
       60 Gramercy Park, Apartment 4C
       New York, New York 10010